# Richmond.

## Virginia Coal and Iron Company v. Louisville & Nashville Railroad Company.

### December 6, 1900.

1. Railroads—*Through Freight—Code, Sec. 1295—Liability for Defaults of Connecting Carriers—Case at Bar.*—By the terms of section 1295 of the Code, when a common carrier accepts for transportation anything directed to a point of destination beyond the terminus of its own line or route, it is deemed thereby to assume an obligation for its safe carriage to such point, unless, at the time of such acceptance, such carrier be released or exempted from such liability by contract in writing, signed by the owner or his agent. Connecting carriers become the agents of the initial carrier, and the latter is liable for their default in failing to transport the goods safely, or for charging a greater rate of freight than that agreed on. In the case at bar, there was no such release, and the initial carrier is bound to make good the rate of freight it had guaranteed.

2. Interstate Commerce Act—*Through Rates—Mistake in Making Rates—Liability for Guaranteed Rate.*—The Interstate Commerce Act does not prevent a railroad company from establishing a through freight rate from a point in one State to a point beyond its terminus in Canada, based upon its existing rate, and the rates quoted to it by connecting carriers, and a mistake in making such rate, when none of the parties intended to violate the law, will not render void a contract made by the initial carrier guaranteeing the rate so established.

3. Interstate Commerce Act—*Guaranteed Rate—Failure of Connecting Carriers to Comply with Act—Effect on Guaranty.*—The failure of a connecting carrier who is subject to the Interstate Commerce Act to comply with the provisions of that act cannot affect the validity of a contract made by an initial carrier who has complied with said act, whereby the latter guarantees a particular rate of freight over the entire route.

Error to a judgment of the Circuit Court of Wise county, rendered December 13, 1899, in an action of *assumpsit*, wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Reversed.*

This was an action of *assumpsit* brought by the plaintiff in error to recover the sum of $1,540.93, paid by the former in excess of the guaranteed rate of freight on certain shipments of coal from Appalachia, in this State, to Worthington, Ontario, over the defendant's road and connecting lines. The case was tried by the court upon an agreed state of facts, and a judgment rendered in favor of the defendant. The facts agreed are as follows:

" In October, 1896, the Virginia Coal and Iron Company (to be styled Va. Coal & Iron Co.) asked of the Louisville and Nashville Railroad Company (to be styled L. & N.) the freight rate per ton on coke in carload lots from Appalachia, Virginia, to Worthington, Ontario.

" The reason for the inquiry was that Crerar, Clinch & Co. were negotiating a sale of coke to be made by Va. C. & I. Co. to the Twill Mining and Manufacturing Co., of Worthington, the shipping point on the Va. C. & I. Co. being at Appalachia, on the line of L. & N.

"At that time the duly established rate of the L. & N. from Appalachia to Cincinnati, O. (the northern terminus of L. & N.), was $1.10 per ton.

" The duly established rates of the Cleveland, Cincinnati, Chicago and St. Louis Railway Co. (to be styled Big Four), and of the Ohio Central lines (to be styled O. C.) was 80 cents a ton from Cincinnati to Toledo, Ohio. But neither Va. C. & I. Co. nor Crerar, Clinch & Co., nor the Twill Mining and Manufacturing Co. knew of any rate being duly established except the L. & N. rate of $1.10 from Appalachia to Cincinnati.

" By the expression 'duly established,' used above, and to be hereafter used, is meant duly published, and filed in accordance with the act of Congress of February 4, 1887, known as the Interstate Commerce Act, as amended by act of Congress of March 2, 1889, which acts are hereby referred to and made part of the record.

"And it is agreed that defendant need file no further pleas, nor take other steps to make the record show, on appeal, that defendant at the trial raised and relied on the Federal question under said acts.

"At the time of the above mentioned inquiry the L. & N. requested of the Big Four the lowest rate it could make from Cincinnati to Worthington.  The Big Four corresponded with the Michigan Central (to be styled M. C.), and said road advised that its rate from Toledo to Worthington was $1.30 per ton.  Thereupon the Big Four so advised the L. & N., adding that the rate of 80 cents per ton over its line and the O. C. lines from Cincinnati to Toledo would not be reduced.

" Thereupon the L. & N., adding its own rate of $1.10 from Appalachia to Cincinnati, and the 80 cents rate from Cincinnati to Toledo, to the $1.30 rate from Toledo to Worthington, announced to the Va. C. & I. Co. that the through rate would be $3.20 per ton.

" But neither the Va. C. & I. Co., nor Crerar, Clinch & Co., nor Twill Mining and Manufacturing Co., knew of what correspondence said L. & N. had had with any of said connecting lines, nor how said $3.20 was arrived at, nor what part thereof each of said roads was to receive.

"And the said Va. C. & I. Co. at once telegraphed said announcement to Crerar, Clinch & Co.  At the time of the above mentioned inquiries, and during the time of the shipments hereinafter mentioned, there was no established joint rate from Appalachia to Worthington, nor from Toledo to Worthington.

" The M. C. acted without the knowledge or authority of the Canadian Pacific in quoting a rate of $1.30 from Toledo to Worthington, and in quoting said rate it made a mistake.

 The duly established rate then and thereafter, during the transportation of all the coke in question in force over the M. C. from Toledo, Ohio, to St. Thomas, Ontario (the terminus of the M. C.), was $1.10 per ton.

 " From St. Thomas to Worthington, Ontario, the regular rate of the Canadian Pacific Railway Company was $3.80 per ton.

" Worthington lies several hundred miles north of St. Thomas, and is reached only by the Canadian Pacific.

" The Canadian Pacific was and is a Canadian corporation, its line running only in Canada.

" The L. & N. road ran from Appalachia, Va., to Cincinnati, Ohio.

" The Big Four from Cincinnati, Ohio, to Dover, Ohio.

" The O. C. lines from Dover, Ohio, to Toledo, Ohio.

" The M. C. from Toledo, Ohio, to St. Thomas, Ontario.

" The C. P. from St. Thomas, Ontario, through Toronto, Ontario, to Worthington, Ontario.

" Upon receipt, on October 22, 1896, of the above-mentioned quotation of a rate of $3.20 per ton, the Va. C. & I. Co. so advised Crerar, Clinch & Co., and on the basis of said rate said Crerar, Clinch & Co. effected a sale of twenty car-loads of coke to the Twill Mining and Manufacturing Co., of Worthington, Ontario, at a price less than usual, because

of said freight rate, to be shipped by Va. C. & I. Co. from Appalachia to Worthington.

"Said Va. C. & I. Co. sold said coke to Crerar, Clinch & Co., f. o. b. cars at Appalachia.

"The L & N. had no correspondence with Crerar, Clinch & Co., nor with Twill Mining and Manufacturing Co.

"Upon effecting said sale, Crerar, Clinch & Co. wrote Va. C. & I. Co. that they had made said sale on a basis of a freight rate of $3.20 per ton.

"Neither the Big Four, the O. C. lines, the M. C. nor the C. P. ever filed with the Interstate Commerce Commission (to be hereinafter styled I. C. C.) any notice of a reduction in rates, and never issued or posted any new schedule or any change in existing tariff sheets. And in issuing tariff E. C. 223, hereafter mentioned, and the bills of ladings guaranteeing a through rate of $3.20, it was not the intention of the L. & N. that its rate of $1.10 to Cincinnati, or the 80 cents rate of Big Four and O. C. lines from Cincinnati to Toledo should be reduced. The L. & N. had no knowledge of the rates of either M. C. or C. P., nor of how it was intended to divide the $1.30 between said two roads.

"When the L. & N. received the quotation above mentioned of $1.30 from Toledo to Worthington, and the Va. C. & I. Co. had accepted the rate quoted to it, i. e., announced (as it did by telegram, November 9, 1896), that it desired to make shipments from Appalachia to Worthington, based on the rate of $3.20 per ton, the L. & N. on November 11, 1896, issued a tariff schedule (E. C. 223) effective November 16, 1896; filed a copy thereof with the I. C. C. on November 12, 1896, posted and published copies at its stations, and on November 11th mailed copies thereof to Big Four, O. C. lines, N. C. & C. P.

"This tariff sheet announced and made public a rate of $3.20 per ton from Appalachia (and other stations on L. & N. in same region) to Worthington.

"The M. C. denies having received any copy of said tariff sheet, and did not post any copy thereof.

"On November 16, 1896, Va. C. & I. Co. shipped on the order of Crerar, Clinch & Co., to Twill Mining and Manufacturing Co. at Worthington, five cars of coke, and the L. & N. issued bills of lading therefor, a copy of one of which is filed herewith as part hereof, marked exhibit 'A,' the others being identical except as to weight and number of cars, which is in the words and figures following, to wit:

Statement.

" '*Exhibit "A," Filed with Agreement.*

" 'Louisvile and Nashville Railroad Company.

" 'Contract No. —, S. A. & O. Jct. Appalachia, Va.   Nov. 14, 1896.

Duplicate.

" 'Received from the Virginia Coal and Iron Company, Stonega, Virginia, the following packages (contents and value unknown), in apparent good order:

| Marks. | No. of Pckg stated fully in writing and figures. | Description of Articles consigned and destination. | Weight Subject to Correction. |
|---|---|---|---|
| No.   4140................... | ........................................... | | 34,000 |
| "   17880 ................... | ........ ................ ............ | | 48,000 |
| "   8012................... | | Coke. | 48,000 |
| "   8123................... | ........ ................................. | | 45,800 |
| "   5875........ ........... | ...... .. ............................... | | 45,600 |
| Chg's advanced, $——... | | | |
| Through rate guaranteed from Appalachia, Va., to Worthington, Ont....... | | Twill Mining & Mfg. Co. Worthington, Ont. | .......... ..... ........ 4 ....... |
| If ............. .......... | ................................................. | | .............. |
| $3.20........................ | ................................................. | | .............. |
| Per ton del'd Worthington, Ont................... | L. & N.. C. C. C. & St. L., M. C. & C. P. | | .............. |

" 'No liability will be assumed for wrong carriage or wrong delivery of goods marked incorrectly or with initial or number.

" 'Consigned and marked as in the margin; to be transported over the lines of this company's railroad to their destined station, if on this company's railroad; or if destined to a point beyond this company's railroad, then to the company's freight station at its terminus, and delivered in like good order to the consignee or owner at said station, or to such company or carrier, if same are to be forwarded beyond said station, whose line may be considered a part of the route to the place of destination of said goods or packages; it being distinctly understood that the responsibility of this company as a common carrier shall cease at the station where the said packages are delivered to such owner, consignee, or carrier; but it guarantees that the rate of freight for the transportation of said packages shall not exceed the rate stated in the margin and charges advanced by this company.

" 'It is further agreed that said packages are received and are to be carried, delivered and forwarded by said company upon the following conditions:

" 'That the said Louisville and Nashville Railroad Company, and the steamboats, railroad companies and forwarding lines with which it connects, and which receive said property, shall not be liable for leakage of oils or any kinds of liquids; breakage of any kind of glass,

earthen or queensware; the injury or breakage of looking glasses, glass showcases, picture frames, carboys of acids, or articles packed in glass; stoves and stove furniture, castings, hollow-ware, machinery, carriages, furniture, musical instruments of any kind, packages of eggs, or for rust iron and of iron articles; nor for injury to the hidden contents of packages; nor for loss in weight or otherwise of grain and coffee in bags, or rice in tierces; or for loss or damage to any article carried from the effect of heat or cold, by wet, dirt, fire, or loss in weight; nor for condition of baling on hay, hemp, or cotton; nor for loss of nuts in bags, or of lemons or oranges in boxes unless covered with canvas; nor for loss or damage of any kind on any article whose bulk requires it to be carried or which is usually or by agreement carried on open cars; nor for damage to perishable property of any kind occasioned by delays from any cause, or by changes of weather; nor for loss or damage on any article of property whatever, by fire or other casualty, in or at any cotton press, or during transportation to or from press, or while in transit, or while in depots or places of reception, or in depot or place of trans-shipment, or at depots or at landings at point of delivery; nor for loss or damage by fire, collision, or dangers of navigation while on seas, rivers, lakes or canals; nor for loss, damage or delay caused by quarantine regulations. All goods. or property under this bill of lading will be subject, at its owner's cost, to the necessary cooperage or baling, and is to be transported to the depots of the companies, or landings of steamboats or forwarding lines, at the point receipted to, for delivery.

" 'It is further agreed that the Louisville and Nashville Railroad Company, and the steamboats, railroads and forwarding lines with which it connects, shall not be held accountable for any damage or deficiency in packages after the same shall have been receipted for in good order by consignee or their agents at, or by the next carrier beyond, the point to which this bill of lading contracts. Consignees are to pay freight at rates above mentioned, and charges upon the goods or merchandise in lots, or parts of lots, as they may be delivered to them, and upon the weights as ascertained by the company's scales. The goods transported shall be subject to a lien, and may also be detained for all arrearages of freight due on other goods by the same consignee or owners.

" 'It is further stipulated and agreed that the Louisville and Nashville Railroad Company, and the steamboats, railroad companies and forwarding lines with which it connects, shall have the privilege of compressing all shipments of cotton at its own expense, but shall not be held responsible for unavoidable delays that may occur in procuring the same to be compressed.

" 'It is further stipulated and agreed that in case of any delay, loss,

detriment, or damage done to, or sustained by, any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such delay, loss, detriment or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon, or on account of, said goods.

" 'And it is further agreed that the amount of the loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of the said goods or property at the place and time of shipment under this bill of lading.

" 'This contract is executed and accomplished, and the liability of the companies as common carriers thereunder terminates, as to the forwarding carriers respectively on delivery to the next connecting carriers respectively; and as to the delivering carrier on the arrival of the goods or property at the station or depots of delivery (and the delivering company shall be liable as a warehouseman only thereafter), and it is hereby distinctly agreed and understood that the consignee or consignees shall promptly receive and take away goods or freight herein receipted for as soon as same is ready for delivery, and in event the consignee fails to receive and remove said freight within forty-eight hours (not including Sundays and legal holidays) after it is ready for delivery, consignee or consignees and consignor agree that the delivering carrier shall be paid the sum of one dollar per day per car for each and every day that the said freight remains in said car after the expiration of the forty-eight hours allowed for unloading, the same being the amount agreed on as liquidated and reasonable damage for the detention of said car per day; all package freight which is not removed by the owners thereof from the custody of the railroad company within forty-eight hours (not including Sundays and legal holidays) shall be subjected thereafter to a charge of one cent per hundred pounds per day, with no charge less than ten cents per package, for the storage for each day, or fraction of a day, that it may remain in the custody of the railroad company, the right being reserved to store such property in public warehouses at the risk and expense of the owners; and for the amount thus accruing, it is contracted and agreed that the delivering carrier shall have a lien on the freight in addition to the carrier common-law lien for freight, charges, and advances, and may detain said freight, or any part thereof for this payment, as well as for other charges and advances.

" 'Notice.—In accepting this bill of lading, the shipper of the property carried expressly accepts and agrees to all its stipulations, exceptions and conditions, and in case of claim for loss, damage, or overcharge, it is to be presented without alteration or erasure.

" 'In witness whereof, the agent hath affirmed to two bills of lading, all of this tenor and date, one of which being accomplished, the others stand void.                                   " 'O. MOUSER, Agent.
                                           " 'Per S. Sheerly.

" 'It is understood that all connections recognize this bill of lading, and will settle freight accordingly. Should overcharges occur, and difficulty arise delaying a prompt adjustment thereof, return this bill of lading to the general freight office of the company, with all freight bills paid the company delivering the freight attached, for settlement.
" 'Claims for loss or damage must be presented to the delivering line within thirty-six hours after the arrival of the freight.'

" The Va. C. & I. Co. had frequently before this time made shipments to points beyond the terminus of L. & N.'s line, and in all cases L. & N. had issued bills of lading in substance the same as above.
" On November 27, 1896, L. & N. received a letter from C. P. stating that the rate of $3.20 was erroneous.
"Advice from the M. C. *via* O. C. lines and Big Four, that an error had been made by the M. C., and that the rate of $3.20 should be withdrawn, was received by the L. & N. December 2, 1896, and on December 3, 1896, notice was given Va. C. & I. Co. and filed with I. C. C. of the withdrawal of E. C. 223, to become effective December 15, 1896. And a new tariff naming a rate of $6.80 per ton was in due time filed with the I. C. C. and duly published.
" On December 14, 1896, Va. C. & I. Co. shipped the remaining fifteen cars, and L. & N. issued bills of lading therefor, of which said 'Ex. A' is an exact copy, except as to date, mark of cars, and weight.
" On arrival of the said coke at Worthington, Ontario, the C. P. insisted upon collecting freight on said coke at the rate of $6.80 per ton, and in addition thereto the sum of $16.06; thereupon the said Twill Mining and Manufacturing Co. telegraphed to Crerar, Clinch & Co. the fact that the said C. P. insisted upon collecting freight at the rate of $6.80; thereupon the said Crerar, Clinch & Co. telegraphed to the Va. C. & I. Co. the fact; thereupon the Va. C. & I. Co. telegraphed the fact to the L. & N., and stated that the cars were lying at Worthington, and requested said last named company to wire correction promptly; that thereupon the L. & N. sent the Va. C. & I. Co. the following telegram, to wit: ' Your wire 10th. If shipment of coke arrived at Worthington overcharged, shipper will have to pay charges, and file claim for all paid in excess of rate previously quoted you. Advised you several days since that error had been made in quotation by lines beyond Toledo'; thereupon the Va. C. & I. Co. telegraphed and wrote to Crerar, Clinch & Co., sending to them the reply which they had received from the L. & N. as aforesaid, and the said Crerar, Clinch &

Co. immediately telegraphed the said reply to the Twill Mining and Manufacturing Co.; and thereupon the Twill Mining and Manufacturing Co. paid to the said C. P. the sum of $2,896.36; that this was $1,540.93 more than the said freight rate would have amounted to at $3.20 per ton; that thereafter the said Crerar, Clinch & Co. repaid to said Twill Mining and Manufacturing Co. said overcharge of $1,540.93, and thereafter the said Va. C. & I. Co. repaid to the said Crerar, Clinch & Co. the said overcharge of $1,540.93, and upon the payment by the said Crerar, Clinch & Co. of the said sum to the said Twill Mining and Manufacturing Co., the last named company assigned its claim on account of said overcharge to the said Crerar, Clinch & Co., and upon payment by the said Va. C. & I. Co. to the said Crerar, Clinch & Co. of the said sum of $1,540.93, the said Crerar, Clinch & Co. assigned their claim on account of the said overcharge to the Va. C. & I. Co.

" There were, as per L. & N. weighing, which is agreed to be correct, 847,150 pounds of the coke, which is 423,572 tons.

" Said number of tons at $6.80 per ton comes to $2,880.30. The consignee paid to the C. P. (exclusive of exchange on which claim is made) $2,896.36.

" The L. & N. on August 9, 1899, prior to the institution of this suit, tendered to the Va. C. & I. Co. $18.75 in legal tender, being the aforesaid $16.06, with interest thereon from December 8, 1896, to date of payment, which tender was refused.

" Said 423,572 tons at $3.20 per ton would make $1,355.43; hence the claim here sued on is $2,896.36, less $1,355.43, *i. e.*, $1,540.93.

" Said sum of $1,540.93 was paid by the consignee to C. P. on arrival of the different shipments, as follows:

" $396 88 on December 8, 1896.
" $352 17 on January 6, 1897.
" $393 31 on January 1, 1897.
" $382 51 on January 8, 1897.
" $ 16 06 in part on each of said dates.
_____
" $1,540 93

" On the transportation of the coke, the L. & N. on delivery to the Big Four at Cincinnati, collected from Big Four $1.10 per ton. On delivery by O. C. lines to M. C., the O. C. lines collected from M. C. for O. C. lines at Big Four 80 cents per ton, and the $1.10 paid to the L. & N. On delivery by M. C. to C. P. at St. Thomas, the M. C. collected from the C. P. $1.10 for itself and the freight it had paid to O. C. lines.

" Neither the L. & N. or any one for it ever paid to the said Twill Mining and Manufacturing Co., nor to said Crerar, Clinch & Co., nor to Va. C. & I. Co., said sum of $1,540.93, or any part thereof, but the L. & N. did tender to the Va. C. & I. Co. as aforesaid, before the insti-

tution of this suit, the sum of $18.75, and since the institution of this suit has paid $16.06 and interest into court, pursuant to the statute. This the Va. C. & I. Co. refused and refuses to accept, and the L. & N. refuses to pay more.

"All parties concerned knew that the line of the L. & N. ran only as far as Cincinnati, Ohio."

*Bullitt & Kelly*, for the plaintiff in error.

*Fulton & McDowell*, for the defendant in error.

BUCHANAN, J. (after stating the case), delivered the opinion of the court.

The defendant in error denies the plaintiff's right to recover upon two grounds—viz.:

First. That no cause of action arose on its guaranty until the principal whose contract it had guaranteed had been prosecuted to insolvency; and, second, that the contract guaranteed was in violation of the act of Congress entitled "An act to regulate commerce," approved February 4, 1887, ch. 104, 24 U. S. Statutes, 379, as amended by act approved March 2, 1889, ch. 382, 25 U. S. Stat. 855.

As to the first objection. If the defendant was only bound, as its counsel contends, to carry the coke to the end of its own line, and there deliver it to the connecting carrier, its agreement or guaranty that the through rate of freight should not exceed $3.20 per ton might perhaps be construed as a collateral and not an original undertaking, as to the freight beyond its own line, so that no action could be maintained upon it against the defendant until its principals had been exhausted. But that is not this case, as we understand it. By section 1295 of the Code, it is provided that when a common carrier accepts for transportation anything directed to a point of destination beyond the terminus of its own line or route, it shall be deemed thereby to assume an obligation for its safe carriage to such point of

destination, unless, at the time of such acceptance, such carrier be released or exempted from such liability by contract in writing signed by the owner or his agent. No such release was obtained by the defendant. When it accepted the coke for shipment, notwithstanding the provisions in the bill of lading to the contrary, it became liable for the transportation of the coke throughout to the point of destination, and the connecting lines of carriers employed in furthering and completing such transportation became its agents for whose defaults it became responsible to the owner of the goods. Hutchinson on Carriers, sec. 145; *Dimmitt* v. *Kansas City, &c.,* 103 Mo. 433; *Ohio & Miss. Ry. Co.* v. *McCarthy,* 96 U. S. 258. Being thus bound to transport the coke safely to its destination, and having agreed that the consideration for doing this should not exceed the rate named, the defendant was liable not only for its own acts but for the acts of its agents, the connecting carriers, in failing to transport the goods safely, or for charging a greater rate of freight than that agreed upon. Having failed to transport the coke at the agreed rate of freight, the defendant was responsible to the plaintiff for the excess of freight charged, unless, as is contended, the agreement was in violation of the Interstate Commerce Act.

There was no intention on the part of the defendant company with whom the contract was made, nor on the part of the connecting lines, subject to the Interstate Commerce Act, to violate that act. It is agreed that the defendant company and the Ohio companies intended to charge, and did charge, their duly established and published rates. Whilst the rate quoted by the Michigan Central was less than the aggregate of its rate and that of the Canadian Pacific, there is nothing to show that, in quoting that rate, it intended to charge less than its duly established and published rate, and its subsequent conduct in collecting from the Canadian Pacific its established rate of freight when the shipments were delivered to that road, shows that, in

quoting the rate of freight over its own line and that of the
Canadian Pacific, it did not intend to make any change in its
own rate, but made a mistake as to the rate of the Canadian
Pacific.   The plaintiff did not intend to violate the act.   Its
object in inquiring of the defendant the freight rate per ton on
coke in car-load lots from Appalachia, Virginia, to Worthington,
Ontario, was for the information of its agents, who were nego-
tiating a sale of coke to parties in Worthington.   No rate from
Appalachia to Worthington had then been established.   When
the defendant informed it what the rate would be, the plaintiff
notified its agents, and they made sale of the coke shipped upon
the basis of the freight rate quoted, and at a lower price than
usual, and notified the defendant that it desired to make ship-
ments at that rate.   Thereupon the defendant issued a tariff
schedule, fixing a rate of $3.20 per ton from Appalachia and
other stations on the defendant's road in that region to Worth-
ington, filed a copy thereof with the Interstate Commerce Com-
mission, posted and published copies at its stations, and mailed
copies thereof to the connecting lines.   The rate was applicable
to all shippers similarly situated.

There is nothing in the Interstate Commerce Act, as we
understand it, which prevented the defendant from establishing
a through rate from Appalachia to Worthington, based upon
its existing rate and the rates quoted to it by the connecting
carriers, which were subject to the Interstate Commerce Act.
The rate thus established was made public and filed with the
Interstate Commerce Commission by the defendant, but not by
the other carriers which were subject to the Interstate Com-
merce Act.   Did their failure to do this make the plaintiff's
contract with the defendant for the shipment of the coke illegal,
or did it not merely subject them to the penalties of the act?
Surely a shipper will not be deprived of the benefit of an other-
wise valid contract for the transportation of his goods because
connecting carriers have failed to perform their duty in giving

publicity to the rate. If he can, no one will be safe in making contracts for the sale or transportation of his goods based upon the published rate of the initial carrier.

We are of opinion that the contract in question was not in violation of the Interstate Commerce Act, and that the plaintiff was entitled to recover from the defendant the amount of freight collected in excess of the agreed rate.

The judgment of the Circuit Court must be reversed, and this court will enter such judgment as it ought to have entered.

*Reversed.*